**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 08a0554n.06
Filed: September 10, 2008

# United States Court of Appeals

## FOR THE SIXTH CIRCUIT

_____

No. 07-3894

_____

| | | |
|---|---|---|
| Natalya Vladimirovna Kopyonkina; | * | |
| Karolina Nikolayevna Kopyonkina, | * | |
| | * | |
| Petitioners, | * | |
| | * | Petition for Review of an |
| v. | * | Order of the Board of |
| | * | Immigration Appeals. |
| Michael B. Mukasey, Attorney General, | * | |
| | * | |
| Respondent. | * | |

_____

Before KEITH, GRIFFIN, and GIBSON,[*] Circuit Judges.

JOHN R. GIBSON, Circuit Judge.

Natalya Kopyonkina and her minor daughter Karolina Kopyonkina appeal the Board of Immigration Appeals' denial of their asylum, withholding of removal, and Convention Against Torture claims. The BIA affirmed the Immigration Judge's finding that Kopyonkina was not credible because of her statement that she was "constantly beaten" when she was merely pushed and insulted. The BIA concluded

_____

[*]The Honorable John R. Gibson, Senior Circuit Judge, United States Court of Appeals for the Eighth Circuit, sitting by designation.

that the two incidents of beatings the IJ credited did not amount to past persecution and that her return to Uzbekistan in 2002 and her husband's continued presence there undermined her claim of fear of future persecution.  The BIA also affirmed the IJ's finding that Kopyonkina did not merit protection under the Convention Against Torture.

Kopyonkina contends that substantial evidence does not support the IJ's adverse credibility ruling, that the two incidents of violence in 2004 amounted to past persecution, and that her fear that she would be killed or tortured upon return because of the government's belief that she is a dissident and spy is well-founded and supported by the documentation she submitted.  But as substantial evidence supports the IJ's rulings, we deny Kopyonkina's petition for review.

I.

Natalya Vladimirovna Kopyonkina and her minor daughter Karolina Nikolayevna Kopyonkina, natives and citizens of Uzbekistan, arrived in the United States on or about July 12, 2004 as non-immigrant visitors.  They exceeded their period of authorized stay.  On May 20, 2005, Kopyonkina sought asylum, withholding of removal, and protection under the Convention Against Torture for herself and her daughter.  In her application, she alleged discrimination and persecution on account of her status as an ethnic Russian and a member of the Russian Orthodox Church.

On February 21, 2006, the IJ conducted a merits hearing, where Kopyonkina testified through a translator.  She stated that she was Russian and Russian Catholic and said, "We are having constant problems because we are Russians and we are Christians."  She elaborated,

> Because we are Russians, we are constantly having trouble.  Then because we are Russians and Christians, we are being followed by Uzbeks.  We are constantly being chased around by—chased around on the streets.  In the schools, children are beat up.  And we cannot even go

to the church in peace, because constantly we are beat by rocks and—on the streets.

She recounted many instances of discrimination on account of her Russian ethnicity, but testified about only two incidents of attack. The first attack occurred on March 27, 2004 in Tashkin when her daughter Karolina was playing in a playground with other Russian children. Kopyonkina stated that Uzbek men, ages seventeen to twenty, chased the children with sticks in their hands and that Karolina was "beat up" on her leg and fell to the ground. Kopyonkina stated that when she tried to come to Karolina's rescue, the teenagers threw rocks at her, insulted her about her Russian ethnicity, and "beat me up also," resulting in bruising to her shoulder and eye. When she reported the incident to the police, the police stated that "all the time children fight with each other and we are not going to spend time on some nonsense like this." She and her daughter were treated by a doctor, with whom she is no longer in contact because the doctor apparently fled for Russia to escape persecution.

The IJ expressed skepticism about the relevancy of this incident, stating to Kopyonkina's counsel, "All right, counsel, you're, you're not going anywhere so far. I just want you to know that." He continued, "If you have some relevant incidents to discuss, please get to it. Otherwise, I'll make a decision now. I'm not impressed with, with your presentation here." At his prompting, Kopyonkina's counsel elicited testimony from Kopyonkina about a second incident of attack that happened on May 5, 2004. On her way back from church with Karolina, two young men, one of whom had a knife, blocked her way, told her that "all Russians are prostitutes" and "wolves" and threatened to cut her. When she grabbed Karolina and attempted to run, they beat her on her head and leg with a heavy object, causing her to fall down to her knees.

Kopyonkina also testified about her family's difficulties in Uzbekistan; she stated that they were "constantly . . . followed around." She said that her mother was threatened "constantly," which caused her mother to move out of her home. She reported many break-ins to her mother's home and her mother's dog being shot. She stated that she witnessed these events because she lived in Tashkin and "constantly

visited" her mother. She also reported insults to her sister, who was "constantly being teased" and at one point lost her earring by having her ear torn by two teenagers. Her mother was granted asylum in the United States, as was her sister, by way of her Afghan husband.

Kopyonkina stated that before the two incidents of attack in 2004, "there was a constant threat" and she "used to be beat up." The IJ tried to clarify what she meant by being "constantly beat up." In response, she related instances of when she was thrown out of or pushed inside the bus, pushed to the ground as she was on her way to buy bread, and insulted by children who threw stones at her and commented disparagingly about her Russian ethnicity.

Kopyonkina also stated that the National Security Service approached her husband twice, inquiring about her whereabouts. As corroboration, she supplied two letters from her husband. She feared that the National Security Service considered her an enemy of Uzbekistan, and she believed that her husband would be drugged in order to extract information about her whereabouts. She also believed that she would be killed upon returning to Uzbekistan and that such things have happened to Russians in the past. Before the hearing was continued, the IJ established that Kopyonkina and her daughter had visited the United States during a prior trip in January 2002 but did not apply for asylum then.

At the continued hearing on March 6, 2006, Kopyonkina's counsel attempted to call four other witnesses to discuss the treatment of Russians and Christians by ethnic Uzbeks and Muslims. The IJ denied her request because none of them was an expert in country conditions or personally knew the petitioners' situation in Uzbekistan, and each appeared on the untimely amended witness list. Over the objection of the government counsel, the IJ allowed the testimony of Christina Meda, Kopyonkina's niece, but her testimony was limited to the subject of a letter from Kopyonkina's husband that she had translated from Russian to English.

The IJ also allowed the testimony of Anjelika Bokorova, Kopyonkina's sister, who testified that she and her sister were afraid of being beaten or killed when they went out. Bokorova stated that her sister was badly beaten on the street many times.

She recalled one incident in 1995 when her sister came home from school "totally beat up and she had blood" and said that "her legs, hands, and face were all beat up." Bokorova stated that she took her sister to the police station to fill out an incident report and then took her to a doctor.

Bokorova also corroborated the two incidents of attack to which Kopyonkina testified. Regarding the first, Bokorova stated that as her niece Karolina went out to take a walk, she and her sister were both beaten. Regarding the second, Bokorova testified that her sister and niece were beaten near a Russian church. Finally, she testified to her belief that if Kopyonkina were to return to Uzbekistan, Kopyonkina would be placed under surveillance by the National Security Service and likely killed.

The IJ denied Kopyonkina's asylum claim. He determined that Kopyonkina was not credible, stating that her testimony was "extremely confusing, evasive, and lacking in detail" and that "clearly it was . . . exaggerated and embellished at every step of the way, and at every level." In support, the IJ pointed out Kopyonkina's claim throughout the testimony that she was followed around "constantly," that she suffered from "constant problems" and "constant attacks." The IJ, during cross-examination, determined that such incidents only amounted to her being pushed or insulted and that Kopyonkina had difficulty recalling incidents with much specificity. The IJ found it odd that Kopyonkina did not mention in her testimony a 1995 incident in which she was purportedly attacked on her way to school, an attack that left her bloodied. (The IJ learned of this incident from the testimony of Kopyonkina's sister). The IJ explicitly rejected Kopyonkina's opinion that the National Security Service in Uzbekistan wishes to arrest or kill her or that they believe her to be a spy or a traitor because "there is no indication" to support this view and even if there were, it was not related to factors that would justify the grant of asylum.

The IJ credited the two incidents that occurred in 2004 because Kopyonkina consistently discussed them in the asylum application, before the asylum officer, and during the merits hearing. However, the IJ determined that these incidents did not rise to the level of past persecution because (1) "it is not clear that there was any serious harm done," (2) "it is also not clear that these incidents were conducted by

anyone other than teenagers," and (3) there was no indication either through testimony or in the country conditions reports that there is any formal organization of people that targets either Christians or ethnic Russians in Uzbekistan.

The IJ also concluded that there was no well-founded fear of future persecution. The IJ noted that Kopyonkina came to the United States in 2002, but returned to Uzbekistan without applying for asylum then. He thought that her return to a country she allegedly feared cast doubt on the sincerity of her fear. The IJ further noted that her husband is still living and working in Uzbekistan.

The IJ denied Kopyonkina's claim for withholding of removal because she failed to establish the lesser burden for asylum. He also denied her claim under the Convention Against Torture because "being chased on two occasions by teenagers with sticks certainly does not constitute torture under the Act."

On June 29, 2007, the BIA dismissed Kopyonkina's appeal and affirmed the IJ's decision. In particular, the BIA agreed with the IJ's finding that Kopyonkina's claim was not credible. It stated that much of Kopyonkina's testimony was "speculative and not cogent and that such testimony therefore was not plausible." The BIA also affirmed the IJ's ruling that the discrimination encountered by the respondents did not rise to the level of persecution and that Kopyonkina did not establish a well-founded fear of persecution because she returned to Uzbekistan in 2002 and her husband remains in Uzbekistan. Finally, the BIA affirmed the IJ's ruling that it is not more likely than not that Kopyonkina would be tortured upon return to Uzbekistan.

II.

We have jurisdiction to review the BIA's final order of removal under 8 U.S.C. § 1252(a)(1). Where BIA adopts the IJ's decision, but also engages in a discussion of its own, as it did here, we review both decisions. Gilaj v. Gonzales, 408 F.3d 275, 282-83 (6th Cir. 2005) (per curiam). We review the agency's findings of fact for substantial evidence. 8 U.S.C. § 1252(b)(4)(B).

A. Adverse Credibility Ruling.

An applicant bears the burden of establishing that he or she qualifies as a refugee. 8 C.F.R. § 1208.13(a). The applicant's testimony, if credible, "may be sufficient to sustain the burden of proof without corroboration." Id.

We consider credibility determinations as findings of fact, which are reviewed under the substantial evidence standard. Sylla v. INS, 388 F.3d 924, 925 (6th Cir. 2004). This means that an IJ's credibility determinations are treated as conclusive "'unless any reasonable adjudicator would be compelled to conclude to the contrary.'" Yu v. Ashcroft, 364 F.3d 700, 702 (6th Cir. 2004) (quoting 8 U.S.C. § 1252(b)(4)(B)). "[T]he petitioner must show that the evidence presented was so compelling that no reasonable factfinder could fail to find the requisite persecution or fear of persecution." Ouda v. INS, 324 F.3d 445, 451 (6th Cir. 2003). "The test is not whether this Court might have decided differently but whether this Court is compelled to conclude that the [IJ] erred." Dorosh v. Ashcroft, 398 F.3d 379, 383 (6th Cir. 2004).

Kopyonkina contends that the BIA erred in affirming the IJ's adverse credibility determination. Even though "an adverse credibility finding is afforded substantial deference, the finding must be supported by specific reasons." Sylla, 388 F.3d at 926. If the reasons the agency gives are inconsistencies in the petitioner's statements, such inconsistencies must go to the heart of the applicant's claim. Id.[1]

---

[1]The REAL ID Act changed the standard governing credibility determinations, stating that those determinations can be made "without regard to whether an inconsistency, inaccuracy, or falsehood goes to the heart of the applicant's claim." Amir v. Gonzales, 467 F.3d 921, 925 n.4 (6th Cir. 2006) (quoting 8 U.S.C. § 1158(b)(1)(B)(iii)). The effective date of the REAL ID Act is May 11, 2005. See 8 U.S.C. § 1158 note (Effective and Applicability Provisions).

Here, it appears that Kopyonkina filed her application after the May 11, 2005 effective date, as her application is dated May 20, 2005 and the date stamp indicates that it was filed on June 3, 2005. However, neither the IJ nor the BIA applied the REAL ID Act standard. But as the agency's findings can be sustained under the more stringent pre-REAL ID Act standard, they can also be sustained under the REAL ID

In his decision, the IJ stated that Kopyonkina's testimony was incredible because it was "extremely confusing, evasive, and lacking in detail" and that "clearly it was . . . exaggerated and embellished at every step of the way, and at every level." Specifically, the IJ pointed to Kopyonkina's claim that she was "constantly beaten" prior to March 2004 when in fact the IJ determined that the extent of her harm was that she was merely insulted and pushed. This is a material inconsistency that provides a cogent basis for the IJ's adverse credibility ruling.

When the IJ asked Kopyonkina if any incidents happened before the two incidents of attack in March 2004, Kopyonkina stated,

> Yes, there was a constant threat. We had a lot of difficulties. We could not go out of the house. Constantly we were in great fear and we, we never could go to any, any bazaars or any places like that to buy anything, because constantly we used to be beat up. And anything could happen to us. We used to be—they would spit on us, we would be beat up, and any time we approached the police, there was not a whole lot that they would do.

In response, the IJ clarified, "So you were constantly beat up before March, 2004?" First, Kopyonkina replied that there were no specific incidents, but then narrated two incidents of being pushed—once on a bus and a second time when she went out to buy bread. During the second incident, she said that she fell to the ground as a result, and the man who pushed her told her that Russians are prostitutes and wolves and that she should not be with Uzbeks. The IJ tried to clarify that being pushed or verbally abused is not being "beaten up" and tried once more to elicit an incident of when she was beaten up. To this, Kopyonkina related another incident when she was pushed and was told that she was a Russian prostitute. Finally, her counsel asked for an incident "where someone actually put their hands on you and hit you" and Kopyonkina admitted there was no specific incident other than the two

Act.

incidents in 2004 that the IJ credited.

Kopyonkina's claim that she was "beaten up" when she was merely pushed and insulted is a material discrepancy in her testimony. We have identified inconsistencies that can validly lead to an adverse credibility finding as those that could be viewed as "attempts by the applicant to enhance his claims of persecution." Sylla, 388 F.3d at 926. Here, Kopyonkina's claim that she was beaten up when she was only pushed or insulted was an attempt to enhance her claim of persecution because physical beatings can form the basis of a claim of persecution, whereas mere offensive conduct, such as being pushed or insulted, cannot. See Ali v. Ashcroft, 366 F.3d 407, 410 (6th Cir. 2004) (concluding that persecution is "an extreme concept that does not include every sort of treatment our society regards as offensive.").

Moreover, this inconsistency is substantial, not irrelevant or minor, because it relates to the basis of her claim that she was beaten and that she will be beaten again upon returning to Uzbekistan. Kopyonkina had much to gain from this embellishment because without it, the treatment she received would not have risen to the level of persecution. See Ramaj v. Gonzales, 466 F.3d 520, 528 (6th Cir. 2006) (adding fear of death threat is an attempt to embellish claim so as to prove persecution). Substantial evidence supports the IJ's adverse credibility ruling on this ground.

## B. Asylum.

Under the Immigration and Nationality Act, the Attorney General may grant asylum to an alien who qualifies as a "refugee," defined as one "who is unable or unwilling to return to . . . [his or her home country] because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. §§ 1158(b)(1) & 1101(a)(42)(A). Thus, there are two alternative ways an applicant may establish eligibility for asylum: (1) the applicant can prove that he or she has suffered past persecution, or (2) the applicant can show that he or she has a well-founded fear of future persecution. 8 C.F.R. § 208.13(b); see Matter of Chen, 20 I. & N. Dec. 16, 18

(BIA 1989) (citations omitted).

### 1.  Past Persecution.

The Immigration and Nationality Act does not define "persecution." However, the BIA has defined persecution as "the infliction of harm or suffering by a government, or persons a government is unwilling or unable to control, to overcome a characteristic of the victim." In re Kasinga, 21 I. & N. Dec. 357, 365 (BIA 1996). Therefore, establishing persecution requires the showing of three elements: (1) harm that is severe enough to rise to the level of persecution, (2) on account of one of the statutorily protected grounds, (3) that is committed by the government or forces the government is either unable or unwilling to control. Navas v. INS, 217 F.3d 646, 655-56 (9th Cir. 2000).

The IJ credited the two incidents of attack that occurred in 2004.  But in denying her claim of past persecution, the IJ stated, "It is also not clear that these incidents were conducted by anyone other than teenagers.  There is no indication that we have any sort of a formal organization of people that target either Christians or Russians in [Uzbekistan]."  He commented that such information was not reflected in State Department reports or in other reports by reliable non-governmental organizations.  The BIA simply concluded that "the discrimination encountered by the respondents did not rise to the level of persecution."  Substantial evidence supports this view.

First, while the identity of her persecutors is unknown, it is clear that Kopyonkina was not harmed by the government.  As the IJ found, both incidents in 2004 were committed by teenagers.  (She herself described the agents of her first attack as "youngsters" and the second as "two young men.").  Here, the crime was committed by two different sets of teenagers, which indicates that there is no one particular or identifiable group that is specifically targeting her and whom the police can control.  Also, as the IJ determined, the record evidence does not show, much less compel, a finding that the teenagers belonged to a formal organization of people that targets either Christians or Russians in the country.

Further, Kopyonkina has not met her burden to show that the government is unwilling or unable to control the group of teenagers. In In re O-Z, 22 I. & N. Dec. 23, 26 (BIA 1998), the BIA concluded that the Ukranian government was unable or unwilling to control the respondent's attackers because the respondent reported at least three of the incidents of violence to the police and the police took no action beyond writing a report. But in Gromovik v. Gonzales, 148 Fed.Appx. 479, 482 (6th Cir. 2005) (unpublished), we concluded that "an isolated instance of governmental acquiescence to an assault does not compel the conclusion that a petitioner was persecuted." In that case, after the petitioner reported an incident of attack to the police, he received a threatening phone call urging him to withdraw the incident report. When the petitioner reported the threat to the police, the police laughed at him. We concluded that this behavior, while "deplorable . . . does not compel the conclusion that they were unwilling to investigate the crime." Id.

Here, Kopyonkina did not report the second incident of attack to the police; therefore, it is unknown whether the police would have investigated or prosecuted the attackers. However, when she reported the first incident to the police, they told her that "children fight with each other and we are not going to spend time on some nonsense like this." But the failure to respond to one incident is in the vein of an isolated governmental acquiescence to an assault that in Gromovik we deemed did not compel a finding that the government was unable or unwilling to control the agents of harm. Kopyonkina did not know the identity of the attackers, which would have made it difficult for the police to apprehend them, and the crime was fairly minor so that the police might not consider it a high priority. The incident appears to be an indiscriminate attack or a random crime that we have determined does not rise to the level of persecution. Gilaj, 408 F.3d at 285.

Moreover, we treat the issue of whether the government acquiesced in an attack as a finding of fact and defer to the agency when, as here, the record evidence does not compel a contrary conclusion. See Mohammed v. Keisler, 507 F.3d 369, 371 (6th Cir. 2007) ("While it is possible a future immigration judge might find differently [that the Pakistani government did not sanction, either affirmatively or by inaction,

- 11 -

the mob that beat the petitioner], given the conflicting evidence in the record, we are not '<u>compelled</u>' to a contrary conclusion.") (emphasis added). Without having established a nexus to the government, Kopyonkina has failed to establish past persecution.

### 2. Well-Founded Fear of Future Persecution.

Without having established past persecution, there is no presumption of a well-founded fear of future persecution. <u>Mikhailevitch v. INS</u>, 146 F.3d 384, 390 (6th Cir. 1998). In order to establish a well-founded fear of future persecution, the applicant must establish that (1) he or she has a fear of persecution in his or her country on account of race, religion, nationality, membership in a particular social group, or political opinion; (2) there is a reasonable possibility of suffering such persecution if he or she were to return to that country; and (3) he or she is unable to return to that country because of such fear. 8 C.F.R. § 208.13(b)(2). An applicant's fear of persecution must be both subjectively genuine and objectively reasonable. <u>See</u> <u>Perkovic v. INS</u>, 33 F.3d 615, 620-21 (6th Cir. 1994).

The IJ and the BIA concluded that Kopyonkina's fear of future persecution was not well-founded because Kopyonkina's return to Uzbekistan in 2002 from the United States and her husband's continued presence in Uzbekistan undermined her claim of fear of future persecution. Substantial evidence supports this view. "An applicant's claim of persecution upon return is weakened, even undercut, when similarly-situated family members continue to live in the country without incident . . . or when the applicant has returned to the country without incident." <u>Hakeem v. INS</u>, 273 F.3d 812, 816 (9th Cir. 2001) (internal quotation marks and citation omitted). Had she feared for her life, she would not have returned to a country that purportedly persecuted her. Instead, she would have applied for asylum during her first stay in the United States. Moreover, her husband, who is also ethnically Russian and Christian, continues to reside in Uzbekistan and is employed albeit by a foreign company. She stated that he was visited by the police two times but that "he does not have any other problems." Her husband's continued presence

- 12 -

in Uzbekistan without persecution, as a similarly situated individual, also undercuts her claim.  Hakeem, 273 F.3d at 816.

Also, her contention that the National Security Service in Uzbekistan wishes to arrest or kill her and that she believes they consider her to be a dissident or a spy is speculative and without support.  It is unclear why she believes the National Security Service would be interested in either her or her husband.  She has not been arrested before nor has she shown that she has had prior trouble with the government.  Further, as the IJ concluded, even if she were to be arrested, it would not be on account of factors that would justify a grant of asylum, but because she stayed out of the country too long.  The letters from her husband are insufficient because they do not establish that the National Security Service is targeting her on account of any factor that would justify the grant of asylum.  The testimony of Kopyonkina's sister was properly discredited by the IJ because it lacked support and was implausible.  In response to why she believes the National Security Service wishes to put her sister under surveillance, she replied, "Because everybody is put under surveillance there."  Her support for her claim that her sister would be killed is that she has known a "few people" who were taken by the National Security Service who never returned.  Finally, the State Department reports provide further support for the IJ's conclusion and do not compel a contrary conclusion.

C.  Withholding of Removal and Convention Against Torture.

An alien qualifies for withholding of removal if he or she can demonstrate that "his or her life or freedom would be threatened in the proposed country of removal on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 C.F.R. § 1208.16(b).  To qualify for withholding of removal, the alien must establish that there is a clear probability that he or she would be persecuted upon return.  Id.  Establishing clear probability means that "it is more likely than not" that he would be persecuted upon return.  8 C.F.R. § 1208.16(b)(2).  This is a more stringent burden than is required for asylum.  Liti v. Gonzales, 411 F.3d 631, 641 (6th Cir. 2005).  Having demonstrated that she failed to establish the lesser burden of

asylum, the IJ correctly concluded that she has necessarily failed to establish the higher burden of proof for withholding of removal. Id.

In order to obtain relief under the Convention Against Torture, an alien bears the burden of proving "that it is more likely than not that he or she would be tortured if removed to the proposed country of removal." 8 C.F.R. § 208.16(c)(2). The IJ correctly found that the two incidents in 2004 did not rise to the level of persecution, no less torture. As Kopyonkina failed to adduce other reliable evidence to indicate that she would more likely than not be tortured, her claim under the Convention Against Torture fails.

### III. Conclusion.

For the foregoing reasons, we DENY the Petition for Review.